IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JUN 20 2013

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

FRATERNAL ORDER OF POLICE METRO )
  TRANSIT POLICE LABOR COMMITTEE, )
INC., )
  )
      Plaintiff, )
  )
  )    1:12cv1387 (LMB/JFA)
  v. )
  )
WASHINGTON METROPOLITAN AREA )
  TRANSIT AUTHORITY (WMATA), )
  )
      Defendant. )

## MEMORANDUM OPINION

Plaintiff Fraternal Order of Police Metro Transit Police Labor Committee, Inc. ("FOP") has brought this civil action against defendant Washington Metropolitan Area Transit Authority ("WMATA"), seeking an Order reinstating two Metro Transit Police officers pursuant to arbitration awards. The parties have filed cross motions for summary judgment, agreeing that no material facts are in dispute. For the reasons that follow, plaintiff's motion for summary judgment will be granted, defendant's motion will be denied, and judgment will be entered in favor of the plaintiff.

## I.  BACKGROUND

Defendant WMATA is an interstate compact agency and an instrumentality of Maryland, Virginia, and the District of Columbia. WMATA operates the Metrorail and Metrobus systems in

the Washington, D.C. metropolitan area, including parts of Maryland and Virginia. Am. Compl., Ex. B ("WMATA Compact")[1] §§ 2, 4. The WMATA Compact authorizes it to operate a police force, the Metro Transit Police Department ("MTPD"), in the Transit Zone, which includes portions of Maryland and Virginia, and all of the District of Columbia. See id. §§ 3, 76. MTPD officers are "charged with the duty of enforcing the laws of the Signatories [Maryland, Virginia, and Washington, D.C.], and the laws, ordinances and regulations of the political subdivisions thereof in the Transit Zone, and the rules and regulations of the Authority [WMATA]." Id. § 76(a). Accordingly:

> A member of the Metro Transit Police shall have the same powers, including the power of arrest, and shall be subject to the same limitations, including regulatory limitations, in the performance of his duties as a member of the duly constituted police force of the political subdivision in which the Metro Transit Police member is engaged in the performance of his duties. . . .
>
> Upon the apprehension or arrest of any person by a member of the Metro Transit Police . . . , the officer, as required by the law of the place of apprehension or arrest, shall either issue a summons or a citation against the person, book the person, or deliver the person to the duly constituted police or judicial officer of the Signatory or political subdivision where the apprehension or arrest is made, for disposition as required by law.

Id. § 76(b), (d).

---

[1] The WMATA Compact can also be found in the Codes of all three jurisdictions in which WMATA operates. See D.C. Code § 9-1107.1; Md. Code Ann., Transp. § 10-204; Va. Code Ann. §§ 56-529, 56-530 (Compacts vol., at 410 (2010)); see also 2009 Acts of Assembly of Virginia, ch. 771.

2

The Compact also includes an immunity provision, which provides in pertinent part:

> The Authority [WMATA] shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agent [sic] committed in the conduct of any proprietary function, in accordance with the law of the applicable Signatory (including rules on conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function. The exclusive remedy for such breach of contracts and torts for which the Authority shall be liable, as herein provided, shall be by suit against the Authority.

Id. § 80.

Plaintiff FOP is "the exclusive bargaining agent" for all "regular, full-time, sworn police officers" employed by WMATA, "excluding all officers having supervisory authority." Am. Compl., Ex. A ("Agreement") Art. 1 §§ 1-2. WMATA and the FOP have entered a series of collective bargaining agreements, the most recent of which was executed on April 18, 2008.[2] See Pl.'s Counter-Statement of Material Facts as to Which There Is No Genuine Issue in Opp'n to Def.'s Mot. for Summ. J. ("FOP's Undisputed Facts")[3] ¶ 2.

---

[2] The Agreement was set to expire on September 30, 2010; however, it remains in effect until either the FOP or WMATA requests changes. See Agreement at 33; FOP's Undisputed Facts ¶ 2.

[3] Each party submitted a statement of undisputed facts. See Def. WMATA's Mot. for Summ. J. [Dkt. No. 15], attach. 1; FOP's Undisputed Facts [Dkt. No. 29]. The set of facts included in the FOP's submission appears to be a superset of those included in WMATA's submission. Because WMATA did not dispute any of the FOP's additional facts in its Reply, this Opinion treats the FOP's Undisputed Facts as the complete set of undisputed facts.

3

The Agreement permits discipline of FOP members only "for just cause." Agreement Art. 5 § 3(a), Art. 14 § 1. Discipline may consist of counseling, reprimand, suspension, emergency suspension, or dismissal. Id. Art. 11 § 1. Dismissal under the Agreement "is the termination of an employee's service for delinquency, inefficiency, or inability to perform the work of the position satisfactorily." Id. Art. 11 § 1(e). The listed grounds for dismissal are:

> (a) Violation of any rules and regulations adopted by the Authority for the safe, convenient and orderly use of Transit facilities to include special operating procedures;
> (b) Violation of any rules and regulations established by the MTP in the form of General Orders, Special Orders, Memoranda and Training Procedures;
> (c) Violation of any regulations, rules, laws, ordinances of the signatories or any political subdivision thereof;
> (d) Violations of any rules, regulations or [sic] signatory police agencies or any political subdivision thereof, which are made applicable through Public Law 94-306.
> (e) The above (a) – (d) includes those laws, ordinances, rules, regulations, procedures, etc., which presently exist or those subsequently enacted.

Id. Art. 11 § 2.

Articles 9 and 10 of the Agreement provide a grievance procedure culminating in arbitration. See also WMATA Compact § 66(c) (providing an arbitration procedure in cases of labor disputes between WMATA and "such employees where collective bargaining does not result in agreement"). Arbitration panels are constituted of one arbitrator selected by the FOP, one

4

arbitrator selected by WMATA, and one neutral arbitrator selected
by rotation from a list of at least three neutral arbitrators
established by mutual agreement of the FOP and WMATA. Agreement
Art. 10 § 2. The panel's "jurisdiction and authority" is
"confined exclusively to the interpretation of the express
provision or provisions of this Agreement at issue between the
parties." Id. Art. 10 § 3. Finally, "[t]he written report of
the Arbitration Panel on the merits of any grievance adjudicated
within its jurisdiction and authority as specified in this
Agreement shall be final and binding on the aggrieved employee,
the Authority [WMATA], and the Union [FOP]." Id.; see also WMATA
Compact § 66(c) ("The determination of the majority of the board
of arbitration . . . shall be final and binding on all matters in
dispute.").

## A. Officer Sherman Benton

On March 1, 2011, Officer Sherman Benton ("Benton") was
vacationing in Atlantic City, New Jersey, with a female
companion. Mem. of Points and Authorities in Supp. of Def.
WMATA's Mot. for Summ. J. ("Def.'s Mem."), Ex. 3 ("Benton
Arbitration") at 1. In their hotel room, Benton and his
companion had a verbal argument that escalated into a physical
altercation; hotel security arrived to investigate a complaint
about the noise and the Atlantic City Police Department was
called. Id. After the police interviewed Benton and his

companion at the police station, Benton was issued a summons charging that he committed assault by recklessly causing injury, specifically small abrasions to his companion's left hand and ear. Id. at 1-2. Although the charges were later dismissed, the Atlantic City Police Department contacted the MTPD, which conducted an internal investigation of the incident. Id. at 2. The investigation relied on reports from the hotel security officers and the Atlantic City Police Department as well as Benton's written statements. Id.

During an administrative inquiry held on March 3, 2011, Benton composed and signed a written statement including answers to written questions prepared by the investigating officer, Sergeant Taran Payne. Id. After reading Benton's statement, Sergeant Payne told Benton that more information was required and that the statement must be truthful; Benton accordingly composed a second statement. Id. After reading that second statement, Sergeant Payne asked Benton if he needed to make a third statement to make his statement completely truthful. Id. In Benton's third statement, he "indicated that he pushed Ms. [REDACTED] twice and she fell to the floor each time and then he 'smooched' her onto the bed with an open hand." Id.

WMATA discharged Benton on April 19, 2011, "for knowingly making false statements during the investigation regarding the March 1 incident and for conduct in his private life that brought

6

discredit or the appearance of discredit upon himself and the MTPD." Id. at 3. The FOP pursued a grievance on Benton's behalf through arbitration. FOP's Undisputed Facts ¶ 6. During the hearing before the Arbitration Board held on January 4, 2012, WMATA withdrew the charge pertaining to Benton's private life; accordingly, the Board considered Benton's termination based only on the charge that "[d]uring the course of the investigation Officer Sherman W. Benton, Jr. asserted that his girlfriend, [REDACTED], did not sustain any injuries during the altercation, when in fact she did." Benton Arbitration at 3, 9 (alteration in original) (quoting WMATA's internal Investigative Report).

On March 28, 2012, the Board issued its decision, finding that the documents submitted were "persuasive in determining that [Benton's companion] suffered an abrasion on the left side of her face near her ear," id. at 11, and that Benton "was not completely truthful concerning Ms. [REDACTED] facial abrasions," id. at 14. Nevertheless, the Board ultimately concluded that because two other officers charged with making false statements during internal investigations had been suspended rather than terminated and because "[t]he just cause requirement that the parties stipulated be used to review this case requires an even-handed application of discipline," id. at 11-12, Benton's "termination [could not] be justified" without "evidence showing that the employees who were suspended for making false statements

7

have had a detrimental affect [sic] on the Department's ability to assist in the prosecution of cases in court," id. at 13. Accordingly, the Board rescinded Benton's termination and instead imposed a one-year suspension. Id. The Board "retain[ed] jurisdiction for 90 days" after the issuance of the award "for the sole purpose of resolving any issue pertaining to the Grievant's reinstatement," but left to the Arbitrator "the sole discretion . . . to determine whether the issue presented by either party is within the jurisdiction of this provision." Id.

## B. Officer Mark Spencer

On January 19, 2011, Officer Mark Spencer ("Spencer"), a WMATA foot patrol officer in his mid-forties with 23.5 years of service, had an altercation with a passenger at the Cheverly Metrorail station. Def.'s Mem., Ex. 2 ("Spencer Arbitration") at 1. The passenger had departed from a station where the fare machines were not working and was told to purchase his fare at the Cheverly station, which was his destination. Id. According to the record, Spencer greeted the passenger with a friendly "good morning," but the passenger responded first with silence, then by stating that he disliked the police and calling Spencer a "sucker." Id. at 1-2. Spencer invited the passenger to come to the back room to settle matters, then extended his baton and carried it extended while following the passenger. Id. at 2.

8

The passenger contended that Spencer struck him with the baton, but Spencer denied doing so. Id. at 2-3.

The passenger used his cell phone to make a video recording of the incident and lodged a complaint with the MTPD three days later. Id. After the completion of an internal investigation, WMATA discharged Spencer on March 16, 2011. Id. at 1. The FOP pursued a grievance on Spencer's behalf through arbitration. See FOP's Undisputed Facts ¶ 11.

The issue before the Board was whether Spencer actually struck the passenger with his baton, as the passenger testified, or whether he simply held it extended as a defensive measure, as Spencer testified. Id. at 2-3. The Board concluded "that the evidence must be taken to show that the asserted striking of [passenger] by Spencer occurred," and that "[i]n virtually all other situations," inviting a passenger to settle matters in the back room, striking that passenger, and falsely denying the strike would "unquestionably add[] up to discharge for just cause." Id. at 4-5.

The Board found, however, that "the length and quality of Spencer's WMATA service render a mitigating factor of such great weight as to make the application of the discharge penalty an unjust result." Id. at 5. In particular, the Board observed that Spencer was "a mere year and a half away from the 25-year mark which is the characteristic goal of the start of policemen's

retirement," and that "Spencer compiled a record of an exceptionally high order of competence and devotion to duty," as attested to by MTPD Chief Michael A. Taborn.[4]  Id. at 5-6.  For these reasons, on February 8, 2012, the Board directed that Spencer be "reinstated without reimbursement for the lost wages," with "[t]he time between discharge and reinstatement . . . to be applied as a disciplinary suspension." Id. at 6.

## C. Maryland Recertification

Although there is no evidence in the record that the MTPD has a formal policy requiring all its officers to be "licensed to perform police activities by the appropriate licensing authorities in Maryland and Virginia," it follows this practice. Def.'s Mem., Ex. 1 ("Durham Aff.") ¶ 3.[5]  In Maryland, that licensing authority is the Maryland Police Training Commission ("Maryland Commission"), a division of the Maryland Department of Public Safety and Correctional Services. See Code of Md. Regulations § 12.04.01.01.  Maryland law requires a police officer to be certified before he may exercise law enforcement powers in Maryland.  See id. § 12.04.01.01(B)(4).  This

---

[4] Chief Taborn was the MTPD Chief during all time periods relevant to this litigation, but is now retired.  See Def. WMATA's Supplemental Mem. in Supp. of Its Mot. for Summ. J. [Dkt. No. 39] at 1.

[5] Counsel represented during the final pretrial conference that the District of Columbia does not have separate licensing requirements.

certification is automatically renewed as long as the police officer "[r]emains employed with the same law enforcement agency." Id. § 12.04.01.06(C)(1). The Maryland Commission must be notified in writing, however, whenever a police officer "[i]s separated from employment as a police officer, by . . . dismissal." Id. § 12.04.01.02. If that police officer is later re-employed by a law enforcement agency, he must be recertified before he may perform police activities in Maryland. See id. § 12.04.01.07(A).

Thus, because the MTPD terminated Spencer and Benton, these officers had to be recertified by the Maryland Commission before they could resume police activities in Maryland. As part of that process, the MTPD was required to send the Maryland Commission various materials, including "copies of criminal records and any derogatory information discovered during the investigation" and an Application for Certification ("AFC"), which "verif[ies] that an applicant has met the applicable Commission selection standards for a position as a police officer." Id. §§ 12.04.01.08(D), 12.04.01.01(B)(2).

Chief Taborn wrote letters to the Maryland Commission after each arbitration award explaining the respective officer's termination and reinstatement. See Dkt. No. 36, attachs. 1 ("Benton Letter"), 2 ("Spencer Letter"). Although the letter concerning Spencer, dated April 27, 2012, requested that the

11

Maryland Commission "consider all the facts relating to Mr. Spencer's service" in its "recertification process," it clearly indicated that the MTPD did not favor recertification. Spencer Letter at 1. Specifically, the letter stated:

> Under normal protocol, MTPD only submits certification requests for candidates we believe qualify under the high standards of the Maryland Training Commission. Clearly, having terminated Spencer for just cause and revoked his police powers accordingly, and to have an outside neutral arbitrator certify that he lied and abused his police power too, we believe he does not meet those requirements.
>
> Please review the enclosed documentation. Credible officers are held in high regard because we know that our word is counted above that of a regular citizen. Mr. Spencer traded on that scared [sic] special trust the public has with police officers and now leans on a badge he tarnished with his lies and abuse of power. No amount of spin, spit and polish can return that shield to its former shine and the Commission should act accordingly in its decision whether to reinstate police powers to this individual.

Id. at 2. Similarly, the letter concerning Benton, dated July 23, 2012, made explicit the MTPD's desire not to reinstate him:

> Mr. Benton's sustained proven history of dishonesty prevents him of useful service [sic] to the Metro Transit Police Department and the law enforcement profession. To require his reinstatement to a position of great public trust in which he cannot possibly serve violates public policy and our Oath of Office. His reinstatement will have a devastating impact on the men and women who serve honorably on the Metro Transit Police Department and will only discredit their hard work.

Benton Letter at 2.

The Maryland Commission denied Spencer's recertification on July 11, 2012, denied Benton's recertification on August 6, 2012,

and denied Benton's subsequent appeal of that decision on October 10, 2012. FOP's Undisputed Facts ¶¶ 8, 12. Neither Benton nor Spencer made any effort to have any Maryland court review the Commission's decision. As a result of the Maryland Commission's decisions, WMATA has not reinstated either officer. Id. ¶ 13.

The FOP informed the Arbitration Board that Benton had not been reinstated as its award required, and that WMATA "maintained that [Benton] no longer met the job qualifications of the WMATA Transit Police Officer." Def.'s Mem., Ex. 4 ("Benton Order") at 1. On September 11, 2012, the Board concluded without explanation that it did not have jurisdiction "to determine whether [Benton] meets the requirements to return to work as a WMATA Transit Police Officer," and memorialized that decision in an Order dated November 19, 2012. Id.

## D. **Procedural History**

The FOP filed this civil action against WMATA, alleging that WMATA breached the collective bargaining agreement by terminating Spencer and Benton without just cause and violated the WMATA Compact by refusing to reinstate the officers as required by the arbitration awards. See Dkt. No. 13.[6] WMATA did not disclose

---

[6] The initial Complaint [Dkt. No. 1], filed on October 12, 2012, alleged that WMATA had breached the collective bargaining agreement and the WMATA Compact by failing to reinstate Benton. After being granted leave to file an Amended Complaint [Dkt. No. 11], the FOP filed an Amended Complaint [Dkt. No. 13] that

13

the two letters that Chief Taborn sent to the Maryland Commission until the day before oral argument of the parties' cross-motions for summary judgment. Because neither side had briefed the impact of those letters on their positions, further briefing was ordered. See Order of May 3, 2013 [Dkt. No. 37]. That briefing has been completed, see Dkt. Nos. 38-39, and the motions are now ripe for decision.

## II. DISCUSSION

WMATA raises several arguments in support of its motion, including claims that this action is barred by the immunity provision in its Compact, that the FOP cannot bring this action because Spencer and Benton did not seek judicial review in Maryland state court of the Maryland Commission's decisions not to recertify them, and that it is entitled to judgment as a matter of law on the merits because its refusal to reinstate officers who are not certified to conduct police activities in Maryland cannot breach either the collective bargaining agreement or the WMATA Compact. Def.'s Mem. at 4, 7, 12. The FOP contends that the immunity provision does not apply to this action, that it does not have to challenge the decision of the Maryland Commission to prevail, and that it is entitled to judgment as a matter of law on the merits because WMATA's refusals to reinstate

---

asserted the same claims against WMATA but added WMATA's refusal to reinstate Spencer.

Spencer and Benton constituted unlawful refusals to comply with valid arbitration awards. Mem. in Opp'n to Def.'s Mot. for Summ. J. and Mem. in Supp. of Pl.'s Cross-Mot. for Summ. J. ("Pl.'s Mem.") [Dkt. No. 28] at 6, 9, 10.

For the reasons explained below, the Court finds that the WMATA Compact's grant of immunity does not extend to this action, that the FOP need not challenge the decision of the Maryland Commission, and that the FOP prevails on the merits because WMATA breached both the collective bargaining agreement and the Compact by failing to comply with the decisions of the Arbitration Board.

## A. **Standard of Review**

Summary judgment is appropriate when the record shows that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the Court must view the record "in the light most favorable to the nonmoving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009). Rather, when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009)

15

(quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)) (internal quotation mark omitted). Because the parties agree that there are no material issues of fact in dispute, <u>see</u> <u>supra</u> note 3, this civil action is ripe for resolution on cross-motions for summary judgment.

## B. <u>Immunity</u>

Whether WMATA is immune from the claims brought in this civil action is a question of subject matter jurisdiction that must be decided before turning to the merits of the parties' positions. <u>See</u> <u>Smith v. WMATA</u>, 290 F.3d 201, 205 (4th Cir. 2002) ("To the extent the METRO's complained-of actions fall within its cloak of immunity, we lack subject matter jurisdiction over such claims."); <u>see also</u> <u>Hagans v. Levine</u>, 415 U.S. 528, 538 (1974) (describing "[t]he District Court's jurisdiction" as "a matter for threshold determination"); <u>O'Neal v. Donahue</u>, 802 F. Supp. 2d 709, 712 (E.D. Va. 2011) ("The Court, as a threshold matter, must determine whether it has subject-matter jurisdiction.").

WMATA argues that it is immune from the FOP's claims because this litigation in essence challenges its "decision to require its police officers to be able to conduct police activities in all three of its Signatory jurisdictions," which it contends "is a decision immune from judicial second-guessing." Def. WMATA's Opp'n to Pl.'s Cross-Mot. for Summ. J. and Reply to Pl.'s Opp'n to WMATA's Mot. for Summ. J. ("Def.'s Reply") [Dkt. No. 33] at 2

(citing <u>Martin v. WMATA</u>, 667 F.2d 435, 436 (4th Cir. 1981)). The FOP responds that "[t]he governmental function of operating a police department does not provide immunity where Section 66 of the Compact requires the arbitration of all labor relations disputes between WMATA and its unions." Reply Mem. in Supp. of Pl.'s Cross Mot. for Summ. J. ("Pl.'s Reply") [Dkt. No. 35] at 2.

It is certainly "well-established that the operation of a police force is a governmental rather than a proprietary function." <u>Morris v. WMATA</u>, 781 F.2d 218, 220 (D.C. Cir. 1986). It is similarly beyond dispute that the federal courts have authority to enforce arbitration awards arising out of labor disputes between WMATA and its unions. See <u>OPEIU, Local 2 v. WMATA</u>, 552 F. Supp. 622, 628 (D.D.C. 1982) (enforcing an arbitral award establishing certain bargaining units among WMATA's employees and rejecting WMATA's argument that because its Compact "makes no provision for enforcement" of arbitral awards, "the only sanction is the force of public opinion"), <u>aff'd</u>, 724 F.2d 133 (D.C. Cir. 1983). The issue presented in this civil action is how to resolve a conflict between these two principles, which appears to be a question of first impression.

By enacting the WMATA Compact, "the signatories of the Compact, and Congress through its legislative approval of the document, clothed WMATA with immunity from suit of the type the Supreme Court has recognized sovereigns enjoy." <u>Dant v. District</u>

of Columbia, 829 F.2d 69, 74 (D.C. Cir. 1987). Generally, "[i]f
an activity is a 'quintessential[] governmental' function, such
as 'police activit[y],' it is within the scope of WMATA's
sovereign immunity." Burkhart v. WMATA, 112 F.3d 1207, 1216
(D.C. Cir. 1997) (quoting Dant, 829 F.2d at 74) (second and third
alterations in original). Accordingly, courts have recognized
that this immunity shields WMATA from claims brought under 28
U.S.C. § 1983 challenging the dismissal of an MTPD officer who
violated several police regulations. See, e.g., Morris, 781 F.2d
at 220.

Nevertheless, to extend WMATA's immunity to all employment
actions regarding its police force would render its agreement
with the FOP to be bound by arbitral decisions a nullity. See
Agreement Art. 10 § 3 ("The written report of the Arbitration
Panel on the merits of any grievance adjudicated within its
jurisdiction and authority as specified in this Agreement shall
be final and binding on the aggrieved employee, the Authority
[WMATA] and the Union [FOP]."); see also WMATA Compact § 66(c).
By agreeing to arbitrate its labor disputes with the FOP's
members, WMATA has waived any immunity that might otherwise
shield it from suits to enforce the awards resulting from those
arbitral proceedings. See Martin v. WMATA, 273 F. Supp. 2d 114,
118-19 (D.D.C. 2003) ("Although WMATA is immune from tort claims
arising from the hiring, firing, and supervision of its

employees, it is not immune from breach of contract claims on employment issues to which it consented to be contractually bound.").

This understanding comports with the plain text of the WMATA Compact's waiver of immunity. The Compact provides that WMATA "shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agent [sic] committed in the conduct of any proprietary function, . . . but shall not be liable for any torts occurring in the performance of a governmental function." WMATA Compact § 80. Although this provision explicitly shields WMATA from suits for "torts occurring in the performance of a governmental function," it also includes a "clear and unequivocal" waiver of sovereign immunity for contract claims. See Lizzi v. Alexander, 255 F.3d 128, 133 (4th Cir. 2001) ("The compact explicitly waives WMATA's sovereign immunity for breaches of contract . . . ."), overruled in part on other grounds by Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721 (2003); Beebe v. WMATA, 129 F.3d 1283, 1289 (D.C. Cir. 1997) ("Section 80 of the Compact waives WMATA's sovereign immunity for contractual disputes.").

The FOP has brought claims sounding in breach of contract, specifically breach of the collective bargaining agreement (Count I) and breach of the WMATA Compact (Count II). Because the plain terms of the Compact unequivocally waive WMATA's sovereign

19

immunity for contractual claims, and because WMATA has agreed in a legitimate collective bargaining agreement to submit labor disputes between it and the FOP to binding arbitration, WMATA is not immune from this litigation.

## C. Exhaustion & Comity

WMATA's second argument characterizes this litigation as the FOP's attempt to overturn the Maryland Commission's decisions not to re-certify Spencer and Benton. Using this characterization, WMATA contends that the FOP is prohibited from bringing this action because neither it nor the officers availed themselves of the opportunity for judicial review of that decision in Maryland state court. WMATA further argues that it is entitled to summary judgment because the Maryland Commission is a required party under Fed. R. Civ. P. 19(b) but has not been joined and could not be joined pursuant to the Eleventh Amendment. See Def.'s Mem. at 7-11; Def.'s Reply at 3; Def.'s Supplemental Mem. in Supp. of Its Mot. for Summ. J. ("Def.'s Supplemental Mem.") at 3-5.

In the instant litigation, however, the FOP has assumed "that neither officer can be assigned to work in Maryland," and contends "only that Benton and Spencer must be reinstated and assigned to work in Virginia and the District of Columbia." Pl.'s Mem. at 9-10. Because plaintiff's position does not in any respect challenge the Maryland Commission's decisions, WMATA's argument fails.

## D. **Merits**

The record regarding the merits of this litigation is sparse but not materially disputed. The MTPD operates within the "Transit Zone," which are those portions of Virginia, Maryland, and the District of Columbia serviced by the Metrorail and Metrobus systems. See Durham Aff. ¶ 3. MTPD officers are responsible for patrolling Metrorail stations and trains. Id. ¶ 4. Although all five Metrorail lines operate in part in Maryland, WMATA also operates Metrobus systems in Virginia and in the District of Columbia that do not cross into Maryland. See id.; Pl.'s Mem., attach. 1 ("Archer Aff."), Exs. 2, 3. MTPD officers are based out of one of five facilities: (1) District 1 (Northeast Washington, D.C.); (2) District 2 (Fairfax County, Virginia); (3) District 3 (Alexandria, Virginia); (4) Special Operations Division (Prince Georges County, Maryland); and (5) Criminal Investigations Division (Prince Georges County, Maryland). Archer Aff. ¶ 3. Officers must bid to be assigned to the two special divisions in Maryland, and WMATA can assign officers based out of the three remaining facilities to patrol areas outside of Maryland. Id.

MTPD practice requires officers to be "licensed to perform police activities by the appropriate licensing authorities in Maryland and Virginia." Durham Aff. ¶ 3. This practice was confirmed during oral argument, when counsel for both parties

21

stated that they were not aware of any active MTPD officers who were not certified in both Maryland and Virginia. Moreover, Captain Kevin Gaddis from the MTPD stated on the record that although some sworn MTPD officers had temporarily been assigned to do administrative work, those officers could be called out to the street during critical incidents and were expected to maintain their certifications. The MTPD's practice is not, however, memorialized in any General Order, rule, or regulation, and is not listed in any job description or recruiting information. Archer Aff. ¶ 5.

WMATA argues that it cannot reinstate Benton and Spencer unless they can perform police activities in Washington, D.C., Maryland, and Virginia, and that this position does not conflict with the arbitration awards because those awards did not "address the issue of whether WMATA is required to reinstate an officer who is no longer qualified to conduct police activities in Maryland." Def.'s Mem. at 12. The FOP rejoins that the arbitration awards require WMATA to reinstate these two officers and, by inference, to accommodate their lack of certification in Maryland by assigning them to duties outside of Maryland. It further contends that WMATA could avoid its duty to reinstate the officers only if the arbitral awards violate a public policy "based on clearly defined law." Pl.'s Mem. at 17.

It is well settled that "federal policy favors the peaceful resolution of labor disputes through arbitration." OPEIU, Local 2 v. WMATA, 724 F.2d 133, 137 (D.C. Cir. 1983). The arbitral decisions in this civil action must be reviewed using "the common law of labor arbitration," in particular the Steelworkers Trilogy, in which the United States Supreme Court "embraced the common law's deference to arbitral awards." Id. at 139; see United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960); United Steelworkers v. Am. Mfg. Co., 363 U.S. 564 (1960); United Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593 (1960). Under that common law, courts may review whether an arbitrator exceeded the scope of his jurisdiction as well as whether an award is sufficiently definite or arbitrary and capricious. OPEIU, Local 2, 724 F.2d at 140. Additionally, "courts will not enforce an award that is contrary to law or explicit public policy," but those policies must "be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest." Id. (quoting W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers, 461 U.S. 757, 766 (1983)) (internal quotation mark omitted).

The record before the Court does not support any finding of a defect in the arbitral awards. No party has argued that the arbitrators exceeded the scope of their jurisdiction or that the

awards lacked definiteness or were arbitrary or capricious. Nor is there any evidence that the awards are contrary to law or explicit public policy.

Although the WMATA Compact charges the MTPD "with the duty of enforcing the laws of the Signatories," and provides that an individual MTPD officer "shall have the same powers . . . and shall be subject to the same limitations . . . in the performance of his duties as a member of the duly constituted police force of the political subdivision in which the Metro Transit Police member is engaged in the performance of his duties," WMATA Compact § 76, it does not require each police officer to be certified in each jurisdiction. Moreover, the record establishes that there are bus routes and Metrorail stations in Virginia and the District of Columbia where these two officers are qualified to work, as well as administrative positions that would not require them to perform police duties in Maryland. Reinstating these officers therefore would not require WMATA to violate Maryland law.

At best, WMATA can only show that the arbitral awards require it to depart from its unwritten practice of requiring all MTPD officers to be licensed in all three jurisdictions. Such an unwritten practice does not justify disregarding WMATA's clear obligation under both its collective bargaining agreement with the plaintiff and its own Compact to honor legitimate arbitration

decisions.[7] Accordingly, "WMATA has failed to carry the heavy burden necessary to displace the presumption that arbitral awards are to be enforced as written." OPEIU, Local 2 v. WMATA, 724 F.2d 133, 141 (D.C. Cir. 1983).

The legitimacy of WMATA's position is further undercut by the two letters written by Chief Taborn to the Maryland Commission, in which he advised the Commission of his view that neither officer should be recertified. See Benton Letter at 2 ("Mr. Benton's sustained proven history of dishonesty prevents him of useful service [sic] to . . . the law enforcement profession."); Spencer Letter at 2 (stating that "we believe [Spencer] does not meet" the "high standards of the Maryland Training Commission" for certification). Through these letters, WMATA sought the very condition, lack of certification, that forms the basis for its argument that it cannot comply with the arbitral awards and reinstate the two officers. This conclusion is supported not only by Chief Taborn's explicit statement that reinstating Benton as required by the arbitration panel would "have a devastating impact on the men and women who serve

---

[7] If it is indeed "essential that Transit Police Officers be able to perform police activities in all three jurisdictions," Def.'s Mem., Ex. 1 ("Durham Aff.") ¶ 4, the MTPD can ensure that all its officers have this ability by making its unwritten practice an explicit policy and by listing certification in Maryland and Virginia as a job requirement in its recruiting materials and posted Job Description for Metro Transit Police Officer. See Archer Aff. ¶ 5, Exs. 4-5.

honorably on the Metro Transit Police Department and will only discredit their hard work," Benton Letter at 2, but also by his repeated references to the officers' terminations "for just cause." See id. at 1 ("I terminated Metro Transit Police Officer Sherman Benton . . . for just cause."); Spencer Letter at 1 ("Mark Spencer was Terminated for just cause . . . ."); id. at 2 ("[H]aving terminated Spencer for just cause . . . ."). These statements sharply conflict with the conclusions of the Board, which found that neither Benton nor Spencer had been terminated for just cause. See Benton Award at 13-14; Spencer Award at 5.

WMATA argues that "[t]he Transit Police cannot be criticized for undermining the arbitral process . . . for complying with Maryland law." Def.'s Supplemental Mem. at 3. But Maryland law only requires police agencies to "[f]orward copies of criminal records and any derogatory information discovered during the investigation to the Commission." Code of Md. Regulations § 12.04.01.01(D)(2). Certainly no blame could be cast on the MTPD had it simply provided the Maryland Commission with information concerning the underlying incidents; however, these letters went far beyond simply providing "derogatory information" and actively sought to influence the certification process with the apparent goal of avoiding the reinstatements ordered by arbitration.

WMATA's further contention that any complaints the FOP had regarding the certification proceedings should have been appealed to a Maryland state court misses the point. The correctness of the Maryland Commission's certification decisions is not in dispute; Chief Taborn's letters are pertinent to this litigation only as evidence of WMATA's intentions regarding its duty to comply with the arbitration awards. Having received such letters, it is no wonder that the Maryland Commission declined to recertify the officers. As discussed above, that denial of recertification does not support WMATA's position that it cannot comply with the arbitral awards.

## III.   CONCLUSION

For the reasons stated in this Memorandum Opinion, plaintiff's Cross-Motion for Summary Judgment [Dkt. No. 27] will be GRANTED, defendant's Motion for Summary Judgment [Dkt. No. 15] will be DENIED, and judgment will be entered in favor of the plaintiff by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 20 day of June, 2013.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge